L.L.C. And we should have Mr. Mark, excuse me, Mr. Ernest Leonard and for Lowe's, Mr. Mark Little and Anthony J. Luciano, so I only see two arguments, do we have three? Yes, Your Honor, Lowe's is actually splitting the argument, I'll be taking the first part and then my colleague, Mr. Lucheson, will be taking the second part. Okay, we'll hear first from Mr. Leonard, Mr. Leonard, you may proceed, I don't hear you, I don't hear anything coming from you yet. Thank you, Your Honor. Can you hear me now? Yes. May it please the court, this is Ernest Leonard on behalf of the appellate for Presidio, L.L.C. As described in the brief, this case involves a real estate project in Fort Worth, Texas that was being developed by North Presidio, Lowe's was intended to be an anchor tenant. As described in the brief, there was a signed contract, which was the agreement to enter into ground lease, which contemplated that three contracts would then be signed at closing. The most important issue is how did Judge McBride certainly try to put you in a box and nail it tight, so where did he commit an error? The primary one has to do with that we do have an enforceable contract. Under the FACTS plan, we have a situation, and I fully recognize and appreciate the limitation of liability provisions that Judge McBride pointed out to, Section 13B, which was damages would be limited to the earnest money, and Section 35 was that until closing, site development work would be performed at North Presidio's expense. However, under the FACTS plan here, we have a situation where the site development agreement with its $4.3 million damage cap, while it was never executed, is enforceable under Texas law. Now, I would agree it certainly would have been better had North Presidio did no site development work before closing. However, that was not practical, and even the contract contemplated there would be some. Basically, I would rely upon two principles of Texas law that I believe that Judge McBride missed. First of all, it is that an agreement to make a future agreement, which this was, can be specific as to all essential terms, and the essential terms of the site development agreement were set forth in the agreement to enter into ground lease itself. As authority, we cited the Texas appellate court case of APMD Holdings, which Lowe's also cited, which basically enunciated this rule that an agreement to make a future contract could be enforceable under those conditions. That court said that essential terms of those that the parties would reasonably regard as being vitally important elements of their bargain, and very importantly, that court said that material terms of a contract are determined on a case-by-case basis. That is, it's a fact issue. The court also said that Texas courts favor validating contracts rather than voiding them. So in our pleading, Your Honor, we note that Section 7B of the contract almost all but writes out the site development agreement. It lists six detailed and expressed requirements of the site development agreement. The Section 7B of the agreement also contemplated that we'd be doing work, some site development work before closing. We pled that they had weekly telephone conferences, at which time they confirmed that we were doing the work, my client was doing the work under their own criterion, the Lowe's development criterion, and that during these calls, Lowe's affirmed that the terms of the site development agreement with the drafts for being exchanged were acceptable to them. Let me ask, what do you do with Section 35? It seems to clearly say, until the closing, your client's at risk if things don't consonate. Yes, Your Honor, I believe that goes towards the timing of the payment. But in this case, we have some additional facts, which is the conduct of the parties themselves in going forward under promises that they would execute that. And I believe- Okay, so that goes to your non-contractual claims, right? I mean- No, Your Honor, it does. That would. But it also goes under this principle of law, Your Honor, that an agreement to agree could be enforceable. And I understand Judge Boothwright's reliance on Section 35, but I would contend that is a timing of payment issue. In this case, we have the conduct of the parties where they were going forward with Lowe's encouragement to do significant site development work. And therefore, I believe these allegations support the conclusion that the essential terms of the site development agreement had been agreed upon, even though Lowe's thereafter refused to execute the document. Also significant is- Can you help us? It seems that- Okay, Judge Costa asked you about Rule 30- I mean, Section 35. But what about 13b? It doesn't replace 13b. It's not in disharmony with it. It's not at all clear what term of the SDA is- you want it to be enforceable, but what term of it would change our analysis? And that's- I agree with the general principle that an agreement to agree can be enforced in Texas law. That's just a general proposition. But where does it get you? Well, under the pleadings, they had everything worked out. In fact, the only reason that Lowe's gave not to execute the agreement was a change in leadership. So, considering those pleadings, we had everything worked out. And the SDA, which is described in Section 7b, describes their essentially obligation to pay for site development costs that were specific to Lowe's. Okay, what part of the SDA would make the pre-SDA- the pre-closing site development compensable? That's not clear to me, at least. Yes, in Section 7b, it describes in subsection 4, tenants shall pay periodically within 30 days and reimburse landlord for tenant share of the project costs without- including without limitation- the cost of site work. So, the agreement was that the site work that was specific and attributable to Lowe's would be reimbursed. And so, that's essentially something we would take to- you know, take to the jury on that is ask that the- is ask that that amount be determined under that section. You have to- you don't just take the SDA, you have to take the contract, too. The other- even assuming you take the SDA. And the contract will say that pre-SDA site development is not- is only compensable after closing pursuant to Section 35. I understand. You can take them both. I don't see how you get around 35, even if you're allowed to take the SDA. I understand. I believe that's a timing issue, but what we would have here is a- it talks about the payments would be due after the closing. And what we have here is an essential- under Texas law, they had an agreement to agree that's enforceable and we would be entitled to our reimbursements for that. So, you're saying pre-SDA site development is compensable as long as the money is gotten for it after closing, even if it's incurred prior to closing? And if that's your interpretation of construing all those- both those provisions in harmony? I think I understood the question, Your Honor, but what I'm saying is if parties have agreed and should be found to have agreed to the SDA, they would require- it would be required to be paid. And I understand there is that problematic issue with Section 35, which says that no payment is to do- is- would be due until closing. I fully understand that, but I believe what we do have is based upon the conduct of Lowe's, based upon the conduct of the parties, we have all the facts that's supported show that they agreed to this and they should reimburse us for the significant cost that we incurred developing this to be essentially a Lowe's track. The other point of a contract law is if a draft of an agreement is prepared, submitted to parties, each of them expresses their consent, there is no- there's a written contract. And we cited a Supreme Court case for that, that's really just black letter law. And the pleading allegations supported that, the fact that they communicated regularly, they said we affirmed, we agreed to this, and that when it was- at the end of the day, the only thing- reason why they wouldn't sign it was because of a change of leadership. Now Lowe's argues that the fact that drafts were being exchanged meant the assent was not unconditional. However, the fact that what we pled was the only reason they didn't sign it was because of a change of leadership, and I think this is also a fact issue. Now as far- we did also plead some alternative claims because in the event that the SBA cannot be found unenforceable under Texas law, we believe we would be able to recover under promissory estoppel and quantum merit. And promissory estoppel, of course, we cited the elements, promise, reliant, foreseeable reliance, and substantial reliance by us on their benefit- I'm sorry, detriment. Lowe's has two primary arguments. First of all, they say there can't be promissory estoppel because there's an express contract, which was the agreement, which covers the claim. Well, not really. What that does is cover issues, for example, 13b covers limitation of liability, saying that the only thing you get is that the agreement to enter into ground lease and breach is return of the earnest money contract. Well, we have other damages besides site development, and then section 35, as I mentioned, is timing. The agreement, the executed agreement to enter into ground lease does not give rights itself to reimbursement for site development, which is what Lowe's argued to judge the gride. If that's the case, that agreement did not cover reimbursement to- our right to reimbursement. Without the agreement to enter into ground lease only, we would not be entitled to do anything. That's why this is not a matter of an express contract covering the same subject matter. The other argument they made was that we did not plead an adequate promise. Well, we pled in paragraph 15 of the complaint that based upon their frequently stated intent to consummate the agreement and enter into the ground lease and other contracts, that we, North Presidio, spent substantial funds and resource to develop the property in a manner that would accommodate them according to Lowe's criteria. Now, Lowe's argues in several cases. They cite a case from this court in 2010, Atkins, which the court found promises- that thought promises to resolve claims for extra work at a later date were too vague. Well, that's not what we have here. We have here something very specific. Do the work and we'll enter into the SDA. They also cited Wiseman case, which says an agreement to agree cannot support a claim for promissory estoppel. Well, that case is a bit different because that really involved promissory estoppel as an affirmative defense. And the court used the example of an oral agreement to sell real estate that would be otherwise barred by the statute of frauds and said, you can't backdoor an unenforceable agreement in by using a promissory estoppel argument. And there's also, they also cited a case from the court of appeals, City of Beaumont in Texas Court of Appeals that said a commitment to complete performance under contract does not give rise to a promissory estoppel claim. Well, that's very different because here the parties were, if this is alternatively planned, so it's assuming there is no contract. So there's no, we agree to complete a contract because here, since it's planned alternatively, that means there is no contract. Quant to a merit, we had the same issue as express contract that I've addressed. And the district court... What benefit did you receive for that claim? You have to have received a benefit, is my understanding. I believe that Lowe's had to receive the benefit. That was the intangible benefit. I'm sorry, I'm sorry. Right. That's right. What benefit did Lowe's receive? Yes. And I want to be very frank. The law is not real clear out there. There's not a law. My argument is they received an intangible benefit because they had the benefit as part of the development plan of a site that was being developed. I've looked quite extensively for cases that address use and enjoy in terms of an intangible benefit. And your honors, I was not able to find a case that directly fit on point. They cited...  I do not, your honor. I'll be very frank. I do not. They cited a couple... They cited a couple... Can I ask you about your fraud claim? Yes, ma'am. Fraud claim... Yes, I don't understand how the new CEO changing direction is fraud. And I don't understand really what... Every once in a while, you pepper into all the various arguments that the new CEO changed direction. I don't understand how that's relevant to any of the claims. So you need to help me with that. Yes, ma'am. At some point in time, they realized they weren't going forward. We don't know what that point in time is. That's why we're relying upon the relaxed standard when they had the information in front of them. If they knew they were not going forward... Your time has expired. You have some time on your own. We'll hear next from Mr. Little or Mr. Lucy. Mr. Little. Mr. Little, okay. You're allotted 13 minutes. Thank you, Your Honor. May I please the court? I plan to focus in my part of the argument on why the contract limitation of liability provision takes care of all of the claims North Presidio pleaded here. Then my colleague plans to talk about some additional independent defects in the non-contractual claims. So before diving into the language of this contract, I think it's helpful to just take a quick step back and look at what kind of contract this is, what it's trying to do. This is a real estate contract. And it shares the same structure as virtually all contracts of its type in that there's a first contract to then close at some later date. Some things will happen leading up to the closing. But when the buyer, the purchaser, enters that first contract, it puts up earnest money. And then it can walk away before closing and just be out that earnest money. This is very common structure. This is how real estate contracts work. And that's exactly what happened here. Lowe's entered into that first contract, put up its earnest money, decided to walk away, and then forfeited its earnest money. Now, when you look at the specific language of the contract, all this is confirmed, in effect, amplified. Your Honors have talked some about Section 13B. That section starts out with a real kind of classic statement of the earnest money framework. If the lease is not consummated on account of Lowe's defaults hereunder, North Presidio shall be entitled as its sole and exclusive remedy hereunder to the receipt of the earnest money deposit. But then Section 13B actually goes beyond that. And it makes clear that that earnest money isn't just the exclusive remedy for a breach of contract claim, but for any claim with really any connection to the agreement. And its language is clear and unequivocal on this point. North Presidio hereby waives and releases any right to sue Lowe's as to any claims, injury, or loss arising from or in connection with this agreement to recover damages over the earnest money deposit. And Texas courts have made clear that that arising from or in connection with language is indeed as broad as it sounds. It encompasses any dispute connected to the agreement, even claims that merely relate to it. So the party has later kind of amplified this or confirmed Section 13B's limitation of liability provision in Section 35, which, Your Honors, I've also brought up this morning. And that's a provision that's in bold, all caps. The parties knew what they were doing. And it says, let's just read it, until the closing, any site work, grading, other work North Presidio undertakes in any other action, money spent, or activity North Presidio undertakes in anticipation of Lowe's leasing the demised premises is strictly at North Presidio's sole risk and expense. Now, my friend on the other side has said that's a timing provision. I'm not exactly sure what he means, but just reading it, it says until the closing, as in unless and until the transaction closes, all of this is at North Presidio's risk and expense. Of course, there was no closing here, so that until the closing term wasn't satisfied. So this Section 13B, Section 35, reading them together, really just leave the clear impression that unless and until the transaction closes, that Lowe's cannot be liable for more than $50,000. So let's apply those provisions here. And I think it's helpful that I don't think the parties actually disagree on many of the key points. For example, North Presidio hasn't challenged whether these provisions are enforceable either as a whole or as any of their claims, nor have they challenged that their contractual and non-contractual claims come within the scope of them. That is for Section 13B that they arise from or in connection with the contract, or for Section 35 that they seek damages for action, money spent, or activity undertaken in anticipation of Lowe's closing the lease, which again, Section 35 says is all at North Presidio's sole risk and expense. So putting that all together, at least for purposes of Section 13B and for Section 35, there's no real dispute apart from a slight dispute on Section 35 that North Presidio's claims come within the scope of these and that they apply at least on their face for these two claims to bar all the contractual and non-contractual claims because North Presidio has now received its earnest money, again, all it's entitled to. So North Presidio, instead of engaging on these key terms, it turns to this version of Section 7B. So let's look at Section 7B. 7B doesn't purport to change anything regarding Section 13B or Section 35. What 7B does is it talks about one of the contracts that the parties are supposed to negotiate leading up to the closing. The closing was to involve the ground lease, a contract called the ECCR, and a contract called the FDA, and then the agreement to enter ground lease, this initial contract that's before the court, that talks about all of them and gives very kind of broad outlines what kinds of terms they are to include, what kinds of areas they were to address. And the contract contemplates that the closing is when the parties execute those contracts and exchange them, and then those three contracts will govern the parties' conduct going forward. But of course, there was no closing or execution here. And so the FDA, whatever terms the parties might have eventually negotiated regarding it, that never came into effect. So not only as your honors have recognized does the kind of general outlines of the FDA reflected in the agreement not purport to alter Section 13B or Section 35, but even if that were otherwise, it simply wouldn't work here because the FDA never became an enforceable contract. And I just want to be clear on this point, this execution was required. It was required to be executed to be binding. And there were a couple of reasons for that. One, if you just read the agreement as a whole, it first differentiates between the agreement to the FDA and the execution of the FDA. And this execution part was supposed to happen at closing. And that makes sense in light of the broader framework of the contract. In Section 13B, Section 35, they make very clear that up until closing, those are the most responsible for $50,000 in damages. And then after closing, the ground lease, the EPCR, and the FCA, they might provide for additional liability. But again, there was no execution, there was no closing, the FCA never came into effect. Mr. Liddle, what do we do with opposing counsel Mr. Leonard's argument that while they couldn't collect the money ahead of time before closing, that the pre-done work could be compensated after closing under the... Yes, Your Honor, I mean... The first agreement. Yes, I understand, Your Honor. I guess a few points here. First of all, in Section 7B, when the contract lays out the six or so terms, calling them terms is kind of generous, the six or so provisions in very general language that the SGA was to include, none of those say, and I don't think that my friend on the other side has contested this, that they mean to apply to work done pre-closing. And if you pair that with both Section 13B and Section 35, which says, I think, very clearly, until the closing, that yields the only possible interpretation being that until the closing, the Section 13B and Section 35 govern. After the closing, if the parties reached agreement on the SGA, executed it, then it would go through. And I think what's, I guess, part of my opposing counsel's argument here is this notion that the SGA contained all the essential terms. And I guess I want to be clear on a few points. I mean, one, North Carolina never pleads breach of the SGA. I want to make that clear because I think it's important to see how all this operates. They plead that we breach the agreement to enter ground lease, that first initial contract, by failing to enter into the SGA. They plead this time and again in their pleadings. They brief it. There is no breach of the SGA claim. It's all about the agreement. So if you look at breach of the agreement, then the limitation of liability provisions, and again, 13B and 35, obviously apply and there's no indication that the stated terms of the SGA alter them. And more important, I guess, even beyond all of that, this notion that the SGA contained all the essential terms just so it matched up to what North Carolina has pleaded. If you look at the terms that North Carolina pleaded, there's the conclusive pleading that Lowe's, quote, assented to the terms of the SGA. And then the only term that actually talks about is this reimbursement for site work provision. But even that term's incomplete because if you look at what they actually plead, it says, and frankly, what the agreement indicates, it says that Lowe's will reimburse North Carolina for, quote, its share of the project cost. But nowhere either in the pleadings or in the agreement does North Carolina ever even say what Lowe's share is, which again, just to go to the broader point, that Section 7B was just laying out a very general framework for some contract that was potentially to come into effect if the parties reached agreement and decided to proceed with closing. But that never happened here. We don't have any terms of the SGA that are either in the agreement or even pleaded that would possibly override the very strong provisions in Section 13B and in Section 35. Also, on this point, I don't think that my opposing counsel has argued this, but I just want to dot on my i's and cross on my t's. To the extent there's any argument that kind of these later oral discussions about the site work and that we assent to the SGA, to the extent he's argued that that somehow does change Section 13B and Section 35, which again, I don't think he is. Just to be clear, Section 24 of the agreement, which is on page 330 of the record, it makes it very clear that you can't amend this without a signed writing. No amendment to this agreement, expressed or implied, shall be binding upon the parties unless such amendment shall be in writing and signed. Again, it's understated there's no signed writing. They haven't pleaded one, so the SGA couldn't, if it contains some terms that somehow aren't pleaded, but the court could still consider them. Again, just couldn't override the clear terms of 13B and 35. And my last point briefly, Your Honor, even if North Dakota City had pleaded a breach of the SGA, and even if they had kind of pleaded full terms, all the essential terms, which we don't know what they are, but even if they had, it still wouldn't change anything. Because even if these were two separate contracts, you would still read the SGA along with the agreement. And the only way to read those two contracts in harmony would be to do, as I said, I guess, a few times now, in that the SGA takes over post-closing and that the agreement's limitation of liability provisions govern pre-closing. So, Your Honor, that's why we think that the court doesn't have to go ability provision to resolve all of North Dakota City's claims. Unless the court has further questions, I'll yield the remainder of my time. Thank you, Seth. Next, hear from Mr. Luciano, who has seven minutes, if you need to. Good afternoon, Your Honors. As my colleague explained, I'm going to be discussing a few additional reasons why the non-contractual claims were properly dismissed. Two in particular, the first of which applies to all three of those claims, and it's that because those claims are functionally duplicative of the breach of contract claim, they're subsumed within it and can't exist apart from it. And then the second, specifically with respect to fraud, is I'll discuss a few of the pleading defects and failure to comply with the particularity requirements under Rule 9b. Turning first to the express contract, Texas courts have been careful to police against parties taking what is in substance a breach of contract claim and rephrasing it in equitable or tort terms. Applying that to the quasi-contract first, the whole point of quasi-contract is that when parties find themselves governed by no agreement, sometimes equity will step in and fill in the gaps. But, of course, that doesn't apply when an express agreement covers the promises, in the case of promissory estoppel, or the services, in the case of quantum merowit. And that's precisely the case here. Turning first to the promises, this is from paragraph 12 of the amended complaint, they plead that the frequently stated intention of Lowe's to consummate the agreement and enter into the ground lease, the ECCR, and the SDA. That promise is an agreement to perform under the agreement, or that promise is a promise to perform under the agreement, to consummate the SDA, to close on the ground lease. And so by failing to perform that promise, Lowe's bore a breach of contract liability, but there's no reason to resort to equity to effectively sidestep the contractual provisions. It's the same story with respect to quantum merowit. The services at issue here are site work performed in anticipation of closing. And I think, as should be painfully clear by now, section 35 of the agreement covers that with about as much particularity as you can imagine. It specifically puts those services at North Presidio's sole risk until closing. So North Presidio cannot take what amounts to a breach of contract claim, services and promises covered by an agreement, and then resort to equity. North Presidio's counsel's argument against that is that no contract covers the services at issue because the agreement doesn't provide for compensation of them. But I think that gets it backwards because the express contract bar applies even when a contract forecloses liability. It covers the services all the same, it just doesn't provide for compensation of them. And that's what makes it all the more important to hold the parties to the terms of their bargain and not allow them to resort to equity. The existence of two potential contracts doesn't alter the calculus either. I'll point the court to this court's opinion in Williams versus Colonial Bank. There, the plaintiff's employee wanted to enforce one contract. This court agreed with the employer that another contract controlled. And because that second contract controlled, it foreclosed the ability of plaintiff to resort to equity to enforce the terms of what was an unenforceable agreement. Now, taking these same principles and applying them to the fraud claim results in what Texas courts refer to as the economic loss rule. And that rule, the gist of it is that if duties and damages sound in contract, then what you've pled is substantively a breach of contract claim, even if you call it something else. Here, both of those defining characteristics align decisively on the side of contract. Again, the promises at issue or the alleged omissions are a failure to perform under the agreement. In other words, that Lowe's failed to disclose that it didn't intend to follow through on the ground lease. That's functionally duplicative of the contractual obligations that they already bore. And so, in that sense, there's no room between that and a breach of contract case. Another way to think about it, I think this is a helpful phrasing, is from the Lincoln General Insurance case, Judge Costa, your opinion, from 2015, where you explained the economic loss rule bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract. Here, applying that principle, if Lowe's had followed through and abided by these promises that North Presidio rephrases in fraud terms, of course there would be no fraud by nondisclosure claim. Turning to the second defining characteristic, which is the damages, here we have the classic case of purely economic loss  In other words, reliance damages in anticipation of closing. North Presidio, I think, candidly concedes this much on page 26 of its opening brief, where it explains that it sought contractual expectancy damages and that the economic loss rule would bar its claim so long as a contractual obligation exists. We would submit that a contractual obligation undoubtedly exists. They sued for it and recovered under it. And so, the fact that they cannot recover their full measure of damages is all the more reason to apply the economic loss rule. The very purpose of which is to avoid parties disregarding unfavorable provisions by recasting breach of contract claims. But even if all of this wasn't substantively a breach of contract claim, turning specifically to the fraud pleadings, I want to just highlight in my time left two failings in that respect. I know that North Presidio relies primarily on the relaxed pleading standards for facts within the defendant's knowledge, but that has no applicability to the first failing of their fraud claim, which related to the duty to disclose. Even assuming there's a duty to disclose here premised on partial disclosures, North Presidio gave no elaboration on what those partial disclosures were, when exactly they occurred over the course of these weekly conference calls that could have happened anymore from a year plus long period, or who from Lowe's affirmatively made those partial disclosures. All of those facts were within North Presidio's knowledge, and their failure to plead them with specificity derails their fraud claim from the outset. Even with respect to facts that perhaps are within Lowe's exclusive knowledge, the relaxed pleading standards for information and belief are not an exception to the particularity requirements under Rule 9b, that's from the Bell helicopter case, nor are they a license to make allegations on information and belief, but yet omit any factual basis for them. That's from the Willard case. And so here, what you have is a multi-month period in which Lowe's must have decided that it wasn't following through, and must have allegedly been able to disclose that. But that allegation could be copied and pasted into any breach of contract case. For that reason, because of the pleadings are deficient, we respectfully request that the court affirm. Thank you, Your Honors. Thank you, sir. Mr. Leonard, do you have five minutes? Owner Lovell. Yes, Your Honor. I would like to follow up on the fraud claim. The nature of our fraud claim, as I mentioned, is that at some point in time, Lowe's knew they were not gonna go forward with our project. We know, at least at the time they told us they've terminated it. We also know that a few months before, as we planned, there was a new CEO, and that there was an announced plan to close stores, as well as reevaluate the new developments. We don't know when that point in time occurred. We won't know until we take discovery. Those are facts only within the mindset, only within the knowledge of Lowe's. If the decision was made, and they allowed us to continue working and doing site development work, then we have the fraud by nondisclosure, because as we planned, we had meeting after meeting, week after week after week. We told them what we're doing. They said, we're fine, keep going. Everything looks good. That's the basis of the claim. We do not have the facts, nor would we, until we have discovery to plead in the particularity. That is why we are relying upon the relaxed standard. As far as the economic loss goes, counsel is exactly right what we stated. This is an alternative pleading. If there is a contract, if the SDA is enforceable, then we would go under that particular theory. We would not have a fraud claim. But the right to damages, the right to reimbursement, that doesn't come under the executed contract. It comes under the site development agreement, which was never executed. And if the court finds that is not enforceable, then we certainly, it would take it outside the economic loss provision, because the duties were not set by a contract, because the contract didn't exist. Nor would the rights or damages be based upon contract, because the contract did not exist. That is why it is an alternative pleading. And then as far as the nature of our duty, they mentioned, they made an argument that we're adopting the restatement section that the Texas Supreme Court has not addressed. Well, actually, we cited the statute, the fraud by non-disclosure elements from this court's opinion. And then we cited also the reply brief that the Supreme Court, although they noted that they had not officially adopted the restatement provisions about fraud by non-disclosure, that it did not hold the other cases that was addressing that did say there's a duty disclosed based upon partial disclosures. It did not held that it was wrongly decided, rather it basically said the evidence before it didn't support an application. So that's the nature of a fraud claim. But we go back to a situation that if the contract itself, if the FDA cannot be enforceable under these circumstances, and I believe the facts do permit it to be enforceable, we should be able to recover the very lease of the promissory estoppel because they certainly did tell us, as we pled, that their intention was to consummate agreement, enter into the ground lease, the ECR, the site development agreement, and relying upon that, we spent substantial funds developing that and incurred expenses upon that. So for that, we believe we're entitled to certainly under the promissory estoppel argument. That's all actually I had at the rebuttal, if there's any questions. We got your argument and the case will be submitted.